# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ACCRESA HEALTH LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| HINT HEALTH INC., | § | CIVIL ACTION NO.  4:18-CV-00536 |
| | § | Judge Mazzant |
| *Defendant.* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| TWIN OAKS SOFTWARE | § | |
| DEVELOPMENT, INC., | § | |
| | § | |
| *Counter-Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Accresa Health LLC's Motion for New Trial (Dkt. #231). Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's motion should be **DENIED**.

## BACKGROUND

Plaintiff Accresa Health LLC ("Accresa") brought this case against Defendant Hint Health Inc. ("Hint"), alleging (1) breach of contract, (2) violation of the Texas Uniform Trade Secrets Act ("TUTSA"), (3) violation of the Federal Trade Secrets Act (18 U.S.C. § 1836), (4) tortious interference with existing contract, (5) fraudulent inducement, and (6) fraud.  Plaintiff is an "innovative healthcare solutions company" whose "primary product offering is a direct primary care (DPC) system that allows employers that cover their employees' healthcare costs to give their

employees freedom and flexibility to choose their own primary care doctor without driving up costs or creating inefficiencies for the employer" (Dkt. #32 at pp. 2–3).

In its Complaint, Plaintiff alleged that Defendant improperly used Plaintiff's trade secrets and confidential information after Defendant fraudulently induced Plaintiff to enter into a Preferred Partnership Agreement ("PPA") with the alleged intent of furthering each entity's economic interest through integrating its product offerings. According to Plaintiff, instead of performing according to the PPA and integrating product offerings, "Defendant . . . obtained and then used [Plaintiff's] trade secrets and confidential information to develop its own product offering that directly competes with [Plaintiff]" (Dkt. #32 at p. 1). Plaintiff further alleged "Defendant is actively using trade secret and confidential information that [Plaintiff] only shared with Defendant for the successful performance of the [PPA] to interfere with and solicit [Plaintiff's] existing and prospective clients" (Dkt. #32 at p. 1).

On September 14, 2020, trial commenced. The jury listened to ten days of trial testimony from approximately 8:30 a.m. to 5:30 p.m. On Friday, September 25, 2020, at 12:54 p.m., the parties began closing arguments (Dkt. #210 at p. 2). At 4:04 p.m., the Court read the jury instructions (Dkt. #210 at p. 2). Rather than starting deliberation the following Monday, the jury elected to work through dinner (Dkt. #210 at pp. 2–3). The Court received six juror notes over the course of the jurors' deliberations that day.[1] Unable to reach a verdict that evening, the Court dismissed the jurors at 10:55 p.m. to reconvene on Tuesday, September 29, 2020.

---

[1] The first note designated the foreperson. The second note included a request to order dinner. The third note simply stated "[a] set of all transcripts and all expert reports"—to which the Court informed the jury that the transcripts and expert reports were unavailable for inspection (Dkt. #225 at p. 4). The fourth note concerned a question regarding the fraudulent inducement claim asserted by Plaintiff. The Court responded to the jury with an answer to the question— namely, that alternative theories exist (Dkt. #225 at p. 18). The fifth note asked for direction on the issue of waiver. The Court referred the jury back to the charge. The sixth note inquired about whether deliberations could resume the following week. The Court subsequently brought the jury to the courtroom and informed them that deliberations were to resume on Tuesday, September 29, 2020.

2

On September 29, 2020, the jury began deliberating further.  The Court received eight additional notes—six through the foreperson and two through other jury members.[2]  The jurors deliberated through lunch, and when no verdict was reached by 5:40 p.m., court was adjourned until 9:00 a.m. the following day.

The jury reached a verdict on Wednesday, September 30, 2020 at 4:27 p.m., following the receipt of two additional jury notes.[3]  The jury found liability for only one claim—Defendant's breach of contract.[4]  The jury also found zero dollars in damages appropriate.  The Court subsequently entered judgment on the verdict.  On November 2, 2020, Plaintiff filed the present motion seeking a new trial on the breach-of-contract claim (Dkt. #231).  On November 16, 2020, Defendant filed its response (Dkt. #235).  On December 1, 2020,  Plaintiff filed its reply (Dkt. #241).  On December 8, 2020, Defendant filed its sur-reply (Dkt. #243).

---

[2] The seventh note requested a second copy of the exhibit notebooks.  The Court informed the jury there was only one copy of the exhibit notebook (Dkt. #226 at p. 2).  The eighth note asked the Court to provide the dates for Plaintiff's Exhibit 2 and Plaintiff's Exhibit 8.  The Court informed the jury it had to rely on each person's recollection of the testimony and time frame of the exhibits (Dkt. #226 at p. 5).  The ninth note stated that the jury had agreed on a majority of the claims but were not in agreement on a few others.  The Court instructed the jury to continue deliberating (Dkt. #226 at p. 6).  The next note, not from the foreperson, asked the Court to send a marshal to the room because a juror had become defensive and threatening. In response, the Court brought the jurors to the courtroom and instructed them that the Court could not send anyone else into deliberations.  The Court further instructed the jury to continue deliberating in a civil manner.  The tenth official jury note stated that the jury had made no progress, and the jury members did not see a way out on three issues.  Specifically, the note stated that "[b]oth sides feel if they were to change their vote, they would violate their good conscience" (Dkt. #226 at p. 14).  It was at that time that the Court and parties agreed to administer the *Allen* charge.  The eleventh note, coming after the *Allen* charge, asked for a dinner menu.  The Court determined it would not order dinner and would instead tell the jury to resume deliberations the following day.  Two more notes came in following the eleventh note: one unofficial and one official.  The unofficial note informed the Court that the jury was "beating two dead horses" and that the author-juror had prior engagements later in the week (Dkt. #226 at p. 22).  The twelfth official note asked whether jurors could remain and look over the evidence after the Court went into recess.  The Court informed the jury that the evidence could only be reviewed when all eight jurors were present (Dkt. #226 at p. 23).

[3] The Court actually received three juror notes; however, note fifteen was to inform the Court that a verdict was reached.  After discussion with the parties, and concern over the jury potentially believing the members could not leave, the Court asked the jury if progress had been made over morning deliberations.  The Court then received note thirteen, which informed the Court that the jury was down to one final claim and progress had, in fact, been made.  Note fourteen informed the Court that one juror could not be present at the end of the week and asked how that affected their deliberations.  The Court responded that the jury need not concern themselves with the time and to keep deliberating (Dkt. #227 at p. 6).

[4] When asked "[d]o you find by a preponderance of the evidence that [Defendant] failed to comply with the 2017 with the 2017 Preferred Partnership Agreement[,]" the jury answered "yes" (Dkt. #223 at p. 3).

## LEGAL STANDARD

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985).  However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is grounds for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  FED. R. CIV. P. 61.

"To be entitled to a new trial, Plaintiff must show that the verdict was against the great weight of the evidence—not merely against the preponderance of the evidence." *Taylor v. Seton Healthcare,* No. A-10-CV-650 AWA, 2012 WL 2396880, at *2 (W.D. Tex. June 22, 2012) (first citing *Dresser–Rand Co. v. Virtual Automation, Inc.,* 361 F.3d 831, 838–39 (5th Cir. 2004); and then citing *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir. 1982)).  A jury verdict is entitled to great deference. *Dresser–Rand,* 671 F.2d at 839.  "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.,* 860 F.2d 1275, 1297 (5th Cir. 1988).

A court may also grant a new trial if the jury returned an impermissible compromise verdict. *See Yarbrough v. Sturm, Ruger & Co.,* 964 F.2d 376, 379 (5th Cir. 1992) (noting that "[i]f the record indicates that a liability verdict stemmed from a compromise on damages, the

4

complaining party is entitled to a new trial, for considerations of damages should not taint the initial question of the defendant's fault" (citing *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir. 1985))).  "A compromise verdict occurs when a jury which is unable to agree on liability compromises that disagreement and awards inadequate damages." *Pagan v. Shoney's, Inc.*, 931 F.2d 334, 339 (5th Cir. 1991) (citations omitted).  "[A] nominal or inadequate finding of damages alone does not automatically mandate the conclusion that a compromise verdict produced the award." *Id.* (collecting cases).  Rather, the Court looks to "any indicia of compromise apparent from the record," *id.* (citing *Hatfield v. Seaboard A.L.R. Co.*, 396 F.2d 721, 723–24 (5th Cir. 1968)), coupled with "other factors which may have caused the jury to return a verdict for inadequate damages,"  *id.* (citing *Hadra v. Herman Blum Consulting Eng'rs*, 632 F.2d 1242, 1244 n.1 (5th Cir. 1980)).

**ANALYSIS**[5]

Plaintiff first asks this Court to grant a new trial on damages because the jury's finding of zero dollars on Plaintiff's breach-of-contract claim is against the great weight of the evidence. Specifically, Plaintiff claims the great weight of the evidence shows that Plaintiff would have earned profits had Defendant complied with the PPA.  Alternatively, Plaintiff claims an entitlement to a new trial, limited to its breach-of-contract claim, on the basis that the jury reached an impermissible compromise verdict.

Defendant responds that a new trial is neither warranted nor appropriate.  Defendant asserts the evidence at trial provided a sufficient basis for the jury to award no lost profits.  Defendant further contends that the jury's zero-dollar damage award provides no basis for a new trial and that the jury's verdict is not a compromise verdict.

---

[5] Although Plaintiff also proceeded to trial on its trade-secret misappropriation and fraudulent inducement claims, Plaintiff only challenges the jury's findings as they relate to breach of contract.

The Court will address each of Plaintiff's arguments in turn.

## I.    Great Weight of the Evidence

"[N]ew trials should not be granted on evidentiary grounds 'unless, at a minimum, the verdict is against the great—not merely greater—weight of the evidence.'" *Shows*, 671 F.2d at 930 (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)).  The trial court may weigh the evidence when considering whether to grant a new trial under this standard, and the evidence need not be taken in the light most favorable to the verdict.  *Id.*

Plaintiff presented both witness testimony and exhibits to the jury in support of its contention that Defendant breached the PPA.  Notably, the jury found that Defendant failed to uphold its end of the PPA.  Thus, the crux of Plaintiff's argument centers around the jury's zero-dollar damages award following its finding of liability.

The Court will now look to the evidence submitted by both parties on the damages issue to determine whether the jury's verdict was against the great weight of the evidence.

"A verdict can be against the 'great weight of the evidence,' and thus justify a new trial, even if there is substantial evidence to support it." *Id.* (citing *United States ex rel. Weyerhaeuser v. Bucon Constr. Co.*, 430 F.2d 420, 423 (5th Cir. 1970)).  The Court therefore looks to the substance of the evidence presented—not merely the number of admitted documents or testifying witnesses.  However, "a judge may [not] order a new trial simply because he disagrees with the jury verdict." *Id.*  Rather, the judge "must be convinced that the verdict is against the great weight of the evidence." *Id.*  The Fifth Circuit has promulgated "three factors that militate against new trials and require a particularly searching review of the evidence." *Id.*  The three factors are "[(1)] simplicity of the issues, [(2)] the extent to which the evidence is in dispute, and [(3)] the absence

of any pernicious or undesirable occurrence at trial." *Id.* (first citing *Conway*, 610 F.2d at 363; and then citing *Spurlin v. Gen. Motors Corp.*, 528 F.2d 612, 620 (5th Cir. 1976)).

### a.  Simplicity of the Issues

Plaintiff only challenges the zero-dollar damages amount returned by the jury on the breach-of-contract claim.  Although both parties submitted evidence to support their respective positions, the question remained relatively simple—how much money, if any, would fairly and reasonably compensate Plaintiff for Defendant's failure to comply with the PPA?  *See Conway*, 610 F.2d at 364 (noting that a factual issue on negligence was simple because the jury ultimately had one question to answer: "by whose negligence, if anyone's, did a truck collision come about?").  That question remained unchanged throughout the trial, despite the introduction of conflicting evidence and Defendant's assertion of affirmative defenses.  The simplicity of the question supports a finding that the jury's verdict is sound and not against the great weight of the evidence. *See Shows*, 671 F.2d at 930.  However, this consideration alone is not dispositive.  The Court will therefore look to the substance of the evidence presented at trial and the extent to which the evidence was in dispute.

### b.  Extent to which Evidence is in Dispute

The parties vigorously disputed almost all evidence presented at trial.  Plaintiff introduced evidence at trial that "the words of the [PPA] show that [Plaintiff] and [Defendant] expected the [PPA] to result in financial gain to [Plaintiff]"  (Dkt. #231 at p. 18).  Further, Plaintiff contends the testimony of its CEO William Short ("Short"), Defendant's CEO Zak Holdsworth ("Holdsworth"), and Defendant's former Vice President of Growth Michael Lubin ("Lubin"), "confirms that the parties expected Plaintiff to earn new revenue from the Integration" (Dkt. #231 at pp. 18–19).  In response, Defendant claims that "nothing in the PPA guaranteed [Plaintiff] would

secure new provider customers if the integration was completed"—a necessary prerequisite for the profits Plaintiff claims it would have received absent the breach (Dkt. #235 at p. 4).  Defendant also strongly contests the witness testimony cited by Plaintiff, noting that "Short admitted a successful integration would result in a 'voluntary opt-in,' meaning doctors would have an opportunity to choose to sign up and pay for [Plaintiff's software]" (Dkt. #235 at p. 4).  In response to the contentions raised by Short, Defendant offered the testimony of Dr. Clint Flanagan ("Flanagan"), the founder and CEO of Nextera.  Because Plaintiff's expert used Nextera as its exemplar subscriber in his damages model,[6] Defendant asked Flanagan if Nextera would ever have opted into doing business with Plaintiff.  Flanagan testified that neither Nextera nor the employers currently engaged with Nextera would have done business with Plaintiff (Dkt. #235, Exhibit 4 at pp. 15–18).

Plaintiff's damages expert, Chase Perry ("Perry"), testified that "[Plaintiff] would earn from the exemplar Nextera revenue of $5.3 million through 2023" (Dkt. #231 at p. 21).  Perry then deducted incremental expenses to reach his estimated $2.6 million in lost profits.  Perry also offered testimony on how he reached that figure.  In response, Defendant employed the expertise of Chin Yu ("Yu").  Yu criticized Perry's lost profits analysis by first highlighting the flaws in using Nextera as a model (Dkt. #235, Exhibit 5 at pp. 14–16).  Yu also pointed out the failures Perry's analysis did not account for in reaching the lost profits amount (Dkt. #235, Exhibit 5 at pp. 17–20).  When ultimately asked whether "any basis to conclude that [Plaintiff] had lost profits at all" existed,  Yu stated there was none (Dkt. #235, Exhibit 5 at p. 20).  The jury was therefore faced with contradicting experts—Plaintiff's expert claimed that over $5 million in revenue

---

[6] Plaintiff's expert, Chase Perry ("Perry"), used Nextera when calculating Plaintiff's estimated damages amount. Plaintiff claims that Perry used Nextera only as an "example in his calculation" (Dkt. #241 at p. 5); however, that point is also contested by Defendant.

existed, before necessary deductions, over five years from a single client alone while Defendant's expert testified that Plaintiff lost no profits at all.  The parties clearly disputed the evidence, and each side offered testimony from multiple witnesses that bolstered its respective position.  While Perry offered a route for the jury that would result in some amount of lost profits damages, Yu gave the jury the support needed to reach its verdict.  Importantly, the evidence in this case was vigorously disputed on almost every topic presented before the jury—including the amount of damages, if any, attributable to Defendant's non-compliance with the PPA.

### c.  Any Pernicious or Undesirable Occurrences at Trial

The Court is unaware of, and the parties have not cited to, any "undesirable or pernicious influence obtruding into the trial."[7]  *O'Neil v. W.R. Grace & Co.*, 410 F.2d 908, 914 (5th Cir. 1969).  The parties and witnesses conducted themselves in accordance with the Court's instructions and directions.  Though objections arose, such is the nature of the adversarial system.  No undesirable or pernicious influence infringed upon the trial.

The parties hotly contested the facts of the case and introduced conflicting evidence through witnesses whose recollections of the events varied.  Further, the experts were vigorously direct- and cross-examined, and each party's counsel offered a different perspective as to how the events occurred during closing arguments.  Taking the facts as presented at trial, the Court does not find that the jury's verdict was against the great weight of the evidence.

---

[7] The parties do not analyze the factors considered by the Fifth Circuit.  The closest claims of pernicious or undesirable influences propounded by Plaintiff are the issuance of the *Allen* charge and the receipt of multiple juror notes.  Seeing as the Court utilized the traditional *Allen* charge found in the Fifth Circuit Pattern Jury Charge, the Court cannot say that the *Allen* charge, in itself, constitutes a pernicious or undesirable influence.  The Court views the jury notes in the same manner—without affirmative objection, and argument related thereto, the Court does not consider the existence of multiple juror notes as pernicious or undesirable influences on the trial.

## II. Compromise Verdict

Plaintiff argues the Court should order a new trial on the breach-of-contract claim due to the jury reaching an improper compromise verdict. Specifically, Plaintiff contends the totality of the circumstances shows that sufficient indicia of compromise exist to warrant a new trial.

Defendant responds that the jury did not reach a compromise verdict. Defendant claims that zero dollars in damages is not inadequate; Plaintiff endorsed the Court's jury instructions and guidance of the jury's deliberations; and the remaining indicia of compromise do not support finding that the jury's verdict was a compromise.

"A compromise verdict occurs when a jury which is unable to agree on liability compromises that disagreement and awards inadequate damages." *Pagan*, 931 F.2d at 339 (first citing *Lucas v. American Mfg. Co.*, 630 F.2d 291, 294 (5th Cir. 1980); and then citing *Freight Terminals Inc. v. Ryder Sys., Inc.*, 461 F.2d 1046, 1053 (5th Cir. 1972)). The Court cannot, however, rest its determination of a compromise verdict on "a nominal or inadequate finding of damages alone." *Id.* (collecting cases). Further, "[n]o compromise exists . . . when another basis for an improper award exists." *Id.* (first citing *Hadra*, 632 F.2d 1242; and then citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1487, 1488 (11th Cir. 1991)). The Fifth Circuit "considers any indicia of compromise apparent from the record . . . and other factors which may have caused the jury to return a verdict for inadequate damages" when "determining whether a compromise verdict exists." *Id.* (first citing *Hatfield*, 396 F.2d at 723–24; and then citing *Hadra*, 632 F.3d at 1244 n.1). As a threshold matter, the Court must determine whether the jury's zero-dollar damages amount is "inadequate."

Plaintiff appears to discuss inadequacy within its overarching argument that the jury's verdict was against the great weight of the evidence. Plaintiff argues that "[t]he evidence of

[Plaintiff's] likely profits consists of the words of the [PPA], trial testimony, and documentary evidence" (Dkt. #231 at p. 17).  Further, Plaintiff claims "the only evidence that [Plaintiff] would have earned zero profits had [Defendant] complied with the [PPA] is [Defendant's] damages expert, Mr. Yu's, unsupported assertion that there is no basis to conclude that [Plaintiff] lost any profits" (Dkt. #231 at p. 17).

Defendant contends "the range presented to the jury at trial was from $0 to $1.4 million" (Dkt. #235 at p. 17).  Defendant argues that "[i]n arriving at its $0 damage award, the jury could well have credited the testimony of [Defendant's] damages expert, Yu[,]" who "pointed out the fatal flaws in Perry's lost profits analysis" (Dkt. #235 at p. 17).  In support of its argument that the range for damages began at zero dollars, Defendant relies on Yu's critique of Perry's lost profits analysis.  Specifically, Defendant relies on Yu's testimony that "the jury was entitled to award anything between $0 damages and $1.4 million" (Dkt. #235 at p. 17).  Defendant states the jury "could easily have chosen to credit Yu's testimony over Perry's and award zero dollars"  for lost profits (Dkt. #235 at p. 17).  The Court agrees that the jury is free to disregard a witness's testimony when it deems the testimony not credible—which it appeared to do with respect to Perry.

No facts in the record indicate that the jury's award was so inadequate as to require a new trial.  Rather, the facts show that when confronted with two experts offering competing opinions on a damages amount, the jury credited one witness over the other.  The Court finds that this credibility determination is within the purview of the jury and such a determination, under the facts presented to the Court, should remain undisturbed.

Even assuming the jury's award was inadequate, the Court does not find the record supports the likely existence of a compromise verdict.

11

The Fifth Circuit looks to several factors to determine whether a compromise verdict exists, including:  " [(1)] whether the issues of liability were strongly contested, [(2)] whether the jury was confused concerning contributory negligence, [(3)] whether either party urged the trial court to accept the verdict it finally rendered, and [(4)] how long the jury deliberated." *Pagan*, 931 F.2d at 339 (citing *Hatfield*, 396 F.2d at 723).  The Court will now examine each of the Fifth Circuit's considerations and look to the totality of the circumstances to determine the likely existence of a compromise verdict.

### a.   Strongly Contested Issues of Liability

Plaintiff argues "[t]he fact that Defendant contested its liability for breaching the [PPA] indicates a compromise verdict" (Dkt. #231 at p. 24).  Defendant responds that "[w]hile it is true that liability was contested in this case, that is not enough, by itself, to support a finding that the verdict was a compromise verdict, particularly given the length of the trial and the complexity of the issues presented" (Dkt. #235 at p. 24).

The Court agrees that the parties' contestation of liability does not, in itself, prove the existence of a compromise verdict.  However, whether liability is strongly contested has been considered by the Fifth Circuit as one indicium of compromise.  *See Hatfield*, 396 F.2d at 723. Because Defendant concedes this factor, the Court need not address it further.  This factor therefore supports finding the existence of a compromise verdict.

### b.   Jury Confusion

Plaintiff claims that "[t]he Jury's confusion and request for additional instructions, particularly on questions related to liability, indicates a compromise verdict" (Dkt. #231 at p. 25). Defendant's response is twofold: first, Defendant distinguishes the cases relied upon by Plaintiff; next, Defendant states that Plaintiff "offers no support that this Court can properly consider alleged

'confusion' regarding an affirmative defense like waiver in considering whether the jury's verdict on damages was a compromise" (Dkt. #235 at p. 20).  Defendant then goes on to assert that Plaintiff "asked, and the Court agreed, not to submit a stand-alone question on [Defendant's] affirmative defenses, which created the confusion in the first place" (Dkt. #235 at p. 21).

Defendant is correct that both cases cited by Plaintiff involve confusion over the issue of contributory negligence.  *See Pagan*, 931 F.2d at 340; *see also Hatfield*, 396 F.2d at 723.  However, *Pagan* does provide insight into *why* the court determined no jury confusion existed, including how "[t]he jury never questioned the magistrate judge about liability" and "it did not ask the court for further instructions."  *Pagan*, 931 F.2d at 340.

The Court received multiple juror notes during deliberation.  The fifth note indicated the jury did not fully understand the concept of waiver as it related to Plaintiff's breach-of-contract claim.  In that note, the jury asked "[w]ould one party agreeing to extend a launch date constitute a waiver of the second party's failure to act in good faith?" (Dkt. #225 at p. 19).  The Court could not provide a substantive response, and both parties agreed that telling the jury to refer to the instructions was appropriate.

Defendant claims Plaintiff cannot rely on any potential confusion stemming from note five because "at the time, [Plaintiff] did not believe there was any confusion—[Plaintiff's] counsel noted 'I think it's clear . . . [t]hey just want to know the effect of the law on the facts'" (Dkt. #235 at p. 21 (quoting Dkt. #231, Exhibit 9 at pp. 19–21)).  However, during that same discussion, Defendant's counsel stated that the jury was "confused by [the question] because it's not clear" (Dkt. #231, Exhibit 9 at p. 20).  Despite the discrepancy, the Court is not persuaded that sufficient jury confusion existed to constitute this factor weighing in favor of a compromise verdict.

13

Waiver appears to be the only breach-of-contract issue on which the jury had any confusion. Importantly, waiver was an affirmative defense that related to the liability question. No facts indicate the jury was confused on any other aspect of Plaintiff's breach-of-contract claim, and the jury did not ask questions about damages. While the jury might have stumbled upon reaching the waiver question, it did not fall. Instead, the jury ultimately returned a competent verdict. The Court is persuaded that the isolated question presented within note five does not sufficiently constitute jury confusion as to indicate the existence of a compromise verdict.

### c. Urging of Parties to Accept Verdict

Plaintiff asserts that "[n]either party here urged the Court to accept the verdict finally rendered, which weighs in favor of finding a compromise verdict" (Dkt. #231 at p. 26). Conversely, Defendant claims that "[*b*]*oth* sides in this case agreed to and urged the Court to accept[] the verdict" (Dkt. #235 at p. 22) (emphasis in original).

After receiving the verdict, the Court read it aloud. The Court then polled each juror to ensure the verdict was unanimous. After dismissing the jury, the Court told the parties it did not see any reason not to enter judgment on the verdict. Plaintiff's counsel agreed: "Your Honor, on behalf of the Plaintiff[], I believe that's correct" (Dkt. #231, Exhibit 11 at p. 12). Defendant's counsel also agreed. The Court then dismissed the parties.

Neither party made objections to the findings contained within the jury's verdict. Further, neither party asked the Court for more time to consider issues contained within the verdict. Rather, both parties agreed that the Court should enter judgment in accordance with the verdict. Absent an indication that Plaintiff disagreed with the verdict,[8] the Court finds this factor does not support finding a compromise verdict.

---

[8] For example, Plaintiff could have moved for a mistrial or requested the Court to "add damages to the jury's findings." *See Yarbrough*, 964 F.2d at 380.

### d. Length of Jury Deliberations

Plaintiff contends that "[t]he jury's deliberating for 22 hours over six days (three workdays) weighs in favor of the Court finding a compromise verdict" (Dkt. #231 at p. 27).   Defendant responds that Plaintiff's argument "ignores the fact that the trial of this case was two weeks long and involved multiple other claims aside from the breach-of-contract claim" (Dkt. #235 at p. 23). The Court agrees that the length of jury deliberations must be analyzed in light of the complexity of the issues, the length of trial, and the surrounding circumstances that may make lengthier deliberations reasonable.

The jury received thirty-one pages of instructions.  Additionally, the verdict form consisted of twenty-eight questions—eleven liability questions and seventeen damages questions. The jury heard approximately ten days of trial testimony, beginning on September 14, 2020, and ending on September 25, 2020.  On the tenth day, the jury received its instructions at 4:04 p.m. (Dkt. #210 at p. 2).  At 4:55 p.m., the Court excused the jury to deliberate, which the jury did until 10:55 p.m. (Dkt. #210 at pp. 2–3).  The jury resumed deliberations on September 29, 2020, at 9:00 a.m. (Dkt. #212 at p. 1).  Court adjourned at 5:40 p.m. that day, and deliberations were to resume the next morning at 9:00 a.m. (Dkt. #212 at p. 2). The jury reached a verdict at 4:27 p.m. on September 30, 2020 (Dkt. #213 at p. 2).  Overall, the jury deliberated for approximately twenty-two hours.

The Fifth Circuit has noted that a jury deliberation lasting a few hours was a "reasonable period after a two-day trial."  *Pagan*, 931 F.2d at 340.  However, as stated by Defendants, "a [c]ourt should not view the length of deliberations in a vacuum[] but should compare the length of deliberations to the overall length of trial" (Dkt. #235 at p. 23).  In the present case, the jury deliberated for three working days following a ten-day trial.  Simply looking at the time ratio of

trial to deliberation, the Court cannot say the jury deliberated for an unreasonably long amount of time.

The circumstances surrounding the deliberations also do not support the finding of a compromise verdict. The Court received fifteen official jury notes. The ninth note—received on September 29, 2020, at 1:10 p.m.—stated that the jury had reached unanimity on a majority of the claims. However, there were still a few claims upon which the jury could not agree. Thus, by its own note, the jury took around eleven hours to dispose of the majority of the claims in the case. The remaining eleven hours were spent deliberating on only a few claims. Note ten—received on September 29, 2020, at 3:10 p.m.—again stated that the jurors could not reach a resolution on a few claims. Specifically, note ten stated that "[b]oth sides feel if they were to change their vote, they would violate their good conscience" (Dkt. #226 at p. 14). After this note, the parties and the Court determined that the *Allen* charge was appropriate. Following the *Allen* charge, the Court received an unofficial note that stated "[w]e are beating two dead horses here and we'll be here for years" (Dkt. #226 at p. 22). At approximately 2:02 p.m. on September 30, 2020, the Court sent a note to the jury asking if progress was being made because a concern had arisen that "the jury [thought] they [could not] go home until they reach[ed] a verdict" (Dkt. #227 at p. 3). The jury answered that it was down to one claim. At 4:25 p.m., the jury reached a verdict.

The juror notes persuade the Court that half the jury's deliberation time was dedicated to only a few claims. However, as noted above, the claims were complex. While the Court received notes about the jury's deadlocked state, a verdict was reached in only a few days. Looking at the notes and length of deliberations in light of the jury hearing two weeks of trial testimony on a variety of complex issues, the Court finds that this factor does not support a finding of a compromise verdict.

Based on the foregoing, the Court does not find a zero-dollar damages award inadequate in light of the jury verdict.  Further, after considering the totality of the circumstances, the Court also does not find the likely existence of a compromise verdict.  Taking all circumstances into account, the Court finds a new trial inappropriate.

## CONCLUSION

It is therefore **ORDERED** that Accresa Health LLC's Motion for New Trial (Dkt. #231) is hereby **DENIED**.

**SIGNED this 11th day of March, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE