# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ACCRESA HEALTH LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § § | |
| HINT HEALTH INC., | § § | CIVIL ACTION NO. 4:18-CV-00536 |
| *Defendants*. | § § § | Judge Mazzant |
| v. | § § § | |
| TWIN OAKS SOFTWARE DEVELOPMENT, INC., | § § § | |
| *Counter-Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Renewed Motion for Judgment as a Matter of Law (Dkt. #232). Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's motion should be **DENIED**.

## BACKGROUND

Plaintiff Accresa Health LLC ("Accresa") brought this case against Defendant Hint Health Inc. ("Hint"), alleging (1) breach of contract, (2) violation of the Texas Uniform Trade Secrets Act ("TUTSA"), (3) violation of the Federal Trade Secrets Act (18 U.S.C. § 1836), (4) tortious interference with existing contract, (5) fraudulent inducement, and (6) fraud. Plaintiff is an "innovative healthcare solutions company" whose "primary product offering is a direct primary care (DPC) system that allows employers that cover their employees' healthcare costs to give their

employees freedom and flexibility to choose their own primary care doctor without driving up costs or creating inefficiencies for the employer" (Dkt. #32 at pp. 2–3).

In its Complaint, Plaintiff alleged that Defendant improperly used Plaintiff's trade secrets and confidential information after Defendant fraudulently induced Plaintiff to enter into a Preferred Partnership Agreement ("PPA") with the alleged intent of furthering each entity's economic interest by integrating its product offerings. According to Plaintiff, instead of performing according to the PPA and integrating product offerings, "Defendant, instead, obtained and then used [Plaintiff's] trade secrets and confidential information to develop its own product offering that directly competes with [Plaintiff]" (Dkt. #32 at p. 1). Plaintiff further alleged "Defendant is actively using trade secret and confidential information that [Plaintiff] only shared with Defendant for the successful performance of the [PPA] to interfere with and solicit [Plaintiff's] existing and prospective clients" (Dkt. #32 at p. 1).

After a ten-day trial, the jury reached a verdict. The jury found liability on only one claim—Defendant's breach of contract. The jury also awarded no damages for this claim. The Court subsequently entered judgment on the verdict. On November 2, 2020, Plaintiff filed the present motion seeking judgment as a matter of law on all claims submitted to the jury (Dkt. #232). On November 17, 2020, Defendant filed its response (Dkt. #236). On December 1, 2020, Plaintiff filed its reply (Dkt. #239). On December 8, 2020, Defendant filed its sur-reply (Dkt. #243).

## LEGAL STANDARD

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "A JMOL may only

be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the

moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## ANALYSIS

Plaintiff asks the Court to grant judgment as a matter of law on damages arising out of Defendant's breach of contract. Further, Plaintiff seeks judgment as a matter of law on both its fraudulent inducement claim and its trade secret misappropriation claim. The Court addresses each claim in turn.

### I.   Breach of Contract

Plaintiff asserts that the Court should grant judgment as a matter of law on the damages element of its breach-of-contract claim "because the facts and inferences point so strongly in favor of [Plaintiff]" (Dkt. #232 at p. 2). Plaintiff claims an entitlement to an award of at least $1.4 million for Defendant's breach of the PPA.

The Court instructed the jury that to prevail on its breach-of-contract claim, Plaintiff had to prove that: (1) a valid, enforceable contract existed between Plaintiff and Defendant; (2) Plaintiff performed, tendered performance, or was excused from performing its contractual obligations; (3) Defendant breached the contract; and (4) Defendant's breach caused damages to Plaintiff (Dkt. #219 at p. 12).

The jury found that Defendant did not comply with the PPA. However, the jury did not find that Defendant's breach caused damages to Plaintiff. The Court will therefore address whether judgment as a matter of law is proper regarding damages.

#### a.   Did Defendant's Breach Cause Damages to Plaintiff?

Plaintiff contends that the great weight of the evidence shows it would have earned additional revenue had Defendant complied with the PPA. Plaintiff also argues that the great

weight of the evidence does not support finding that its expenses would have equaled or exceeded the revenue it would have earned from the integration. Finally, Plaintiff claims the great weight of the evidence shows that it would have earned profits had Defendant complied with the PPA.[1] Defendant responds that Plaintiff failed to show that no reasonable jury could have awarded no lost profits based on the evidence presented at trial.[2]

At trial, the jury heard testimony from Plaintiff's CEO and co-founder William Short ("Short"). Short testified that, due to Defendant's non-compliance with the PPA, Plaintiff lost the opportunity to serve customers such as "Nextera, Strada, and others that [Plaintiff] and [Defendant] identified as likely candidates for the integration" (Dkt. #232 at p. 2). Notably, however, the jury heard from Nextera's CEO and founder, Dr. Clint Flanagan ("Flanagan"), that Nextera would not have done business with Plaintiff, even after a successful integration (Dkt. #235, Exhibit 4 at pp. 15–17). Flanagan testified that the employers working with Nextera would not agree to add an additional $5 or $10 per employee or member per month as required by Plaintiff's platform (Dkt. #235, Exhibit 4 at p. 17). The jury therefore heard conflicting testimony on whether Plaintiff truly did lose customers as a result of Defendant's breach.

Plaintiff also cites the testimony of its damages expert, Chase Perry ("Perry"). Perry testified that Plaintiff lost approximately $2.6 million due to Defendant's non-compliance with the PPA—$1.4 million in present value (Dkt. #232, Exhibit 3 at p. 259–60). To opine on the opinions reached by Perry, Defendant subsequently offered the testimony of Chin Yu ("Yu"). Defendant elicited testimony from Yu in which he pointed out flaws in Perry's analysis. Specifically, Yu testified that Perry "did[] [not] analyze the growth rate for Nextera" and instead "applied a 70

---

[1] Plaintiff has incorporated these arguments, originally made in Plaintiff's Motion for New Trial (Dkt. #231), into the present motion.
[2] Defendant also fully incorporates its arguments presented in its response to Plaintiff's Motion for New Trial (Dkt. #235).

percent growth rate to Nextera because that [is] what he felt [Defendant] would grow at" (Dkt. #235, Exhibit 5 at pp. 14–15). According to Yu, no valid basis existed for Perry's testimony that Plaintiff's revenue from Nextera's business would grow 70% per year for five years (Dkt. #235, Exhibit 5 at p. 15).

Regarding Perry's lost profits analysis, Yu testified both that: (1) Perry did not account for customer turnover and (2) Perry did not "identify the business arrangement that would have caused every single one of Nextera's doctors to bring every single one of their existing patients . . . [to] [Plaintiff's] platform" (Dkt. #235, Exhibit 5 at p. 18). Yu also did not agree with Perry's analysis regarding the incremental costs Plaintiff would have spent related to Nextera's revenue. Ultimately, Yu did not believe $1.4 million in lost profits was a "defensible number" (Dkt. #235, Exhibit 5 at pp. 18–19), and he even testified that there was no basis to conclude that Plaintiff had any amount of lost profits (Dkt. #235, Exhibit 4 at p. 19).

The jury was faced with conflicting expert witness testimony regarding Plaintiff's lost profits. The credibility determinations made regarding the testimony is squarely within the jury's purview, and the Court sees no compelling reason to disturb the jury's decision. Plaintiff fails to present, and the Court does not find, evidence that "points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand*, 361 F.3d at 838. Because Plaintiff did not make the requisite showing as to its lost profits analysis, the Court finds judgment as a matter of law on Plaintiff's breach-of-contract damages inappropriate.

## II.  Fraudulent Inducement

Plaintiff also asserts the Court should grant judgment as a matter of law on its fraudulent inducement claim because the jury could reasonably have found that Plaintiff established each element necessary to support the claim.[3]

The Court instructed the jury that to find in favor of Plaintiff on its fraudulent inducement claim, Plaintiff had to prove: (1) Defendant made a material misrepresentation; (2) Defendant made the representation with knowledge of its falsity or recklessly without any knowledge of the truth and as a positive assertion; (3) Defendant made the misrepresentation with the intention that it should be acted on by Plaintiff; and (4) Plaintiff relied on the misrepresentation in entering into the PPA and thereby suffered injury (Dkt. #219 at p. 9).

### a. Did Defendant Make a Material Misrepresentation?

Plaintiff cites to various pieces of documentary evidence and witness testimony in support of its assertion that Defendant made a material misrepresentation. At trial, the jury saw the PPA, which included language regarding the Parties' agreement to work in good faith with one another. The jury also saw one of Defendant's internal documents that noted Defendant's "need to protect [its] ability to replicate what [Plaintiff] [has]/compete" under a section titled "watch outs" (Dkt. #232, Exhibit 6 at p. 4).  Further, an email written by Zak Holdsworth ("Holdsworth"), Defendant's CEO, stated that Plaintiff was Defendant's "first real competitive threat[,]" and Defendant was "juggling a possible partnership with them designed to somewhat neutralize them" (Dkt. #232, Exhibit 7 at p. 2).  The jury saw an electronic chat between Holdsworth and Michael Lubin ("Lubin"), Defendant's former Vice President of Growth, in which Lubin states "[Defendant]

---

[3] The Court recognizes that the standard for judgment as a matter of law is not what the jury reasonably could have found. Rather, the Court must look to whether the evidence points so strongly in one direction that reasonable jurors could not have reached a contrary conclusion. *See Dresser-Rand*, 361 F.3d at 838  In Plaintiff's reply, it utilizes the correct standard.

need[s] an overall product plan as it relates to creating an Accresa-like knock-off" (Dkt. #232, Exhibit 8 at p. 15).  In addition to the documentary evidence presented, Plaintiff elicited Short's testimony that Defendant never expressed its intention to "neutralize" or create a Plaintiff-like knock-off during either negotiations or the partnership (Dkt. #232, Exhibit 5 at p. 217).  Short also contends Plaintiff would have never entered into a partnership with Defendant if Plaintiff knew of Defendant's desire to neutralize Plaintiff (Dkt. #232, Exhibit 5 at p. 218).

Defendant contends it offered sufficient testimonial evidence as to preclude judgment as a matter of law on Plaintiff's fraudulent inducement claim.  For instance, Defendant presented Holdsworth's testimony that his understanding of the partnership was that Plaintiff was "going to be bringing employees and employers" and Defendant was "going to be bringing providers" (Dkt. #236, Exhibit 1 at p. 18).  Holdsworth further testified that Defendant wanted to co-exist with Plaintiff by forming a partnership, and Defendant did not intend to neutralize Plaintiff in any negative way.  Although Holdsworth admitted that a competitive overlap existed between the two companies, he also stated that "you can either compete with people or you can partner with them and try to co-exist[,] even if they maintain some competitive tension" (Dkt. #236, Exhibit 1 at p. 32).  Lubin offered similar testimony: Defendant wanted to partner with Plaintiff because it "could be beneficial to both companies" (Dkt. #236, Exhibit 3 at p. 18).  Defendant also offered the testimony of other employees who felt the partnership was entered into in good faith.

While Plaintiff offered evidence to support its claim, Defendant offered the testimony of witnesses contradicting Plaintiff's characterization of the evidence.  The jury was therefore faced with evidence and witness testimony that it was free to believe if so inclined.  The existence of competent, contradicting evidence persuades the Court that Plaintiff has failed to present evidence that "points so strongly and overwhelmingly in favor of one party that the court believes that

reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand*, 361 F.3d at 838. Because Plaintiff did not make the requisite showing as to one of the essential elements of its fraudulent inducement claim, the Court need not analyze the other elements.

### III. Trade Secret Misappropriation

Plaintiff finally asks the Court to grant judgment as a matter of law on its trade secret misappropriation claim. In support of its request, Plaintiff argues that the jury could reasonably have found that Plaintiff established each element necessary to support the claim.

The Court instructed the jury that to find in favor of Plaintiff on its trade secret misappropriation claim, Plaintiff had to prove: (1) a trade secret exists; (2) Plaintiff is the owner of the trade secret; (3) Defendant misappropriated any of Plaintiff's trade secrets by doing certain acts[4]; and (4) Defendant's misappropriation of the trade secret caused damages to Plaintiff (Dkt. #219 at pp. 17–18).

#### a. Existence of Trade Secret/Plaintiff Owned Trade Secret

The jury found both that trade secrets existed and that Plaintiff owned the trade secrets. Defendant does not contest the jury's findings, and the Court therefore need not analyze these elements further.

#### b. Did Defendant Misappropriate Plaintiff's Trade Secret?

The jury found that Defendant did not misappropriate Plaintiff's trade secrets.[5] Plaintiff cites primarily to witness testimony to support its assertion that judgment as a matter of law on its

---

[4] The acts included: (1) acquiring the trade secret with knowledge or reason to know that the trade secret was acquired by improper means; or (2) disclosing or using the trade secret without Plaintiff's express or implied consent after having used improper means to acquire knowledge of the trade secret; or (3) disclosing or using the trade secret without Plaintiff's express or implied consent with knowledge or reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the usage of the trade secret (Dkt. #219 at p. 18).
[5] When asked "[d]o you find by a preponderance of the evidence that [Defendant] misappropriated [Plaintiff's] trade secrets[,]" the jury answered "no" (Dkt. #223 at p. 5).

trade secret misappropriation claim is warranted. Defendant responds that the jury could have discredited the testimony of Plaintiff's witnesses. Further, Defendant asserts the jury could also have credited Defendant's proof that contradicted Plaintiff's misappropriation theory.

Plaintiff presented testimony from Short that Defendant needed to know how Plaintiff's system worked in order to successfully carry out the integration. Further, Juan Diosdado ("Diosdado"), one of Plaintiff's developers, testified regarding the meetings between the parties. Diosdado stated that the parties had multiple training sessions in which the respective systems were showcased in an effort to "understand how the data was going to flow" (Dkt. #232, Exhibit 2 at pp. 268–71, 273–74). In addition to Short and Diosdado's testimony, Plaintiff's expert, Dr. Bryan Bergeron ("Bergeron"), offered the ultimate conclusion that Defendant stole Plaintiff's trade secrets. Specifically, Bergeron opined on the changes made by Defendant after working with Plaintiff. Bergeron stated that Defendant obtained Plaintiff's trade secrets through misrepresentation and a breach of confidence allegedly implied by the PPA.

Defendant responds by highlighting the deficiencies in the testimony of Plaintiff's witnesses. Further, Defendant cites to evidence that showed Defendant "never accessed [Plaintiff's] system, much less any trade secrets in its system" (Dkt. #236 at p. 11). Defendant presented evidence to the jury that Defendant did not even have access to the features over which Plaintiff claims trade secret status. Defendant also contends that the jury heard conflicting evidence regarding Defendant's purported breach of confidence—while Holdsworth and Lubin both testified that a duty of non-disclosure may be implied from the relationship between the parties, Defendant presented evidence that the parties neither signed a non-disclosure agreement nor included a confidentiality provision in the PPA. Defendant notes that "not a single witness testified about what trade secrets [Plaintiff] specifically disclosed to [Defendant] at any level of

detail greater than general descriptions" (Dkt. #236 at p. 10) (emphasis omitted). Defendant also indicates that Short did not even know what had actually been disclosed to Defendant (Dkt. #236, Exhibit 6 at pp. 6–7). Defendant further offered the testimony of Jonathan Avida, Defendant's former Head of Product, in support of the proposition that Plaintiff did not disclose any confidential or proprietary information (Dkt. #236, Exhibit 4 at pp. 21, 24–27, 32).

"Credibility determinations, the weighing of evidence, and the drawing of legitimate interferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The jury was presented with competent evidence supporting both Parties' theories on whether Defendant misappropriated Plaintiff's trade secrets. Judgment as a matter of law is therefore inappropriate because Plaintiff has failed to present, and the Court does not find, evidence that "points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand*, 361 F.3d at 838. Because Plaintiff does not make the showing required to establish one of the essential elements for trade secret misappropriation, the Court does not address the remaining elements.

The Parties presented competent evidence supporting their respective positions over approximately ten days of trial. Additionally, both Parties submitted evidence to the jury that contradicted the other side's arguments. Considering the deference to be awarded to the jury's verdict, the Court cannot find that "the facts and inferences point so strongly and so overwhelmingly in [Plaintiff's] favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498, 499 (citation omitted).

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Renewed Motion for Judgment as a Matter of Law (Dkt. #232) is hereby **DENIED**.

**SIGNED this 11th day of March, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE